**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| GLADYS GUZMAN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.  15-841-RGA-MPT |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | |
| | ) | |
| Defendant | ) | |

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

This action arises from the denial of plaintiff's claim for Social Security benefits. On November 2, 2011, plaintiff filed a Title II application for Social Security Disability Insurance Benefits ("DIB").[1]  Plaintiff also filed an application on November 3, 2011 for Supplemental Security Income under Title XVI of the Social Security Act (the "Act").[2]  In her applications and disability report, plaintiff alleged she became disabled on May 20, 2011, due to multilevel degenerative disc disease, degenerative joint disease, fibromyalgia, polyarthritis, chronic asthma, major depression, and posttraumatic stress disorder ("PTSD").[3]  The claims were denied initially on June 22, 2012, and upon reconsideration on December 5, 2012.[4]  Following these denials, plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and the video hearing occurred on

---

[1] D.I. 7 at 28.
[2] *Id.*
[3] *Id.*
[4] *Id.*

May 22, 2014.[5]  At the hearing, testimony was provided by plaintiff and an impartial

vocational expert, Linda Augins.[6]  On June 17, 2014, the ALJ, Irving Pianin, issued a

written decision denying her claims.[7]  Plaintiff requested a review of the ALJ's decision

by the Social Security Appeals Council, which was denied on July 22, 2015.[8]  On

September 21, 2015, she filed a timely appeal with the court.[9]  Presently before the

court are the parties' cross-motions for summary judgment.[10]  For the reasons that

follow, the court will grant the defendant's motion.

## II.   BACKGROUND

Plaintiff was born on April 25, 1959.[11]  She has a GED and past relevant work as

a housekeeper, dishwasher, newspaper inserter, and packer.[12]  Her alleged disability

dates from May 20, 2011.[13]  In May 2011, she was released from her job as a packer

because her physical impairments, including sciatica and back pain, left her unable to

keep up with the demands of the job.[14]  After working as a housekeeper, plaintiff was

incarcerated for ten years for drug conspiracy.[15]  She denies smoking or drinking in

recent years.[16]  Since 2011, plaintiff has developed asthma, stiffness in her joints,

---

[5] *Id.*
[6] *Id.* at 54.
[7] *Id.* at 36-47.
[8] *Id.* at 1.
[9] D.I. 1.
[10] D.I. 11; D.I. 13.
[11] D.I. 7 at 382.
[12] *Id.* at 75-76.
[13] *Id.* at 36.
[14] *Id.* at 59-60.
[15] *Id.* at 62.
[16] *Id.* at 63.

difficulty moving and mental health problems including depression, anxiety, and PTSD.[17]
Despite her prior vocational experience, plaintiff claims she remains disabled under the
Act.[18]  To be eligible, plaintiff must demonstrate she is disabled within the meaning of §§
216(i), 223(d), and 1614(a)(3)(A) of the Act.

### A.    Evidence Presented

### 1.    Musculoskeletal Impairments

Plaintiff has had degenerative disc disease since January 2010, but the
exacerbation of her joint and back pain began around 2011.[19]  A physical exam done in
June 2011 recorded worsening joint pain and right arm and right knee pain that
increased with movement.[20]  The following month, plaintiff was evaluated by John
Sullivan, P.A., who noted her increasing joint pain, osteoarthritis, degenerative changes
in the spine, and complaints of back pains.[21]  An assessment in October 2011 by Dr.
DuShuttle revealed her left knee was swollen, weak, painful, and stiff.[22]  By November
2011, Drs. DuShuttle and Arian's reports suggest she was unable to fully extend her
knee, had pain in her cervical and lumbar spine, and scoliosis in her lumbar spine.[23]

Plaintiff returned to Dr. Arian later in November 2011.[24]  During this visit, she
complained about lower back pain and upper shoulder pain in addition to a shooting

---

[17] *Id.* at 28.
[18] *Id.*
[19] D.I. 7 at 43, 461.
[20] *Id.* at 461.
[21] *Id.* at 411-416.
[22] *Id.* at 667.
[23] *Id.* at 657, 741-742.
[24] *Id.* at 801.

pain into her buttocks and down her legs.[25]  In January 2012, plaintiff alleged flank and

lower back pain, but her primary care physician, Dr. Tankala, deemed her back pain

under fair control.[26]  In a monthly assessment at the end of January with Dr. Adrian, she

still reported pain in her lower back, shoulders, and radiating down her legs.[27]  In

February 2012, Dr. Tankala administered an epidural steroid injection for the low back

pain.[28]  Despite treatment with Drs. Tankala and DuShuttle, the stiffness and pain in her

left knee persisted through May 2012 and was aggravated by motion, especially when

walking long distances and ascending stairs.[29]

Plaintiff sustained a fall at the end of 2011, which resulted in a meniscus tear in

her left knee that was diagnosed in March 2012.[30]  In another monthly pain

management assessment with Dr. Adrian in April 2012, plaintiff described continued

shooting pain from the back radiating down her leg and foot, as well as pain in her wrist

and fingers.[31]  Dr. DuShuttle performed a left lateral meniscectomy on May 18, 2012.[32]

Plaintiff returned to Dr. DuShuttle after this surgery, advising of pain on movement of

the knee, stiffness, and muscle spasms.[33]  She was examined by Dr. Tamesis regarding

continued pain in her lower back, wrists, fingers, and knees and morning stiffness in

August 2012.[34]  Dr. Tamesis diagnosed degenerative joint disease, inflammatory

---

[25] *Id.*
[26] *Id.* at 562, 643.
[27] *Id.* at 796.
[28] *Id.* at 628.
[29] *Id.* at 649, 662-663.
[30] *Id.* at 663, 673.
[31] *Id.* at 777.
[32] *Id.* at 671.
[33] *Id.* at 857.
[34] *Id.* at 716.

polyarthropathy, and back pain.[35]

Plaintiff was in a car accident on November 26, 2012 that caused neck and back pain exacerbated by lifting.[36]  The pain and stiffness in her knee continued through 2012.[37]  Although she struggled with a decreased range of motion following the accident, Dr. DuShuttle reported only mild to moderate shoulder pain by the end of December 2012.[38]

Plaintiff visited Dr. Cemerlic for the first time in April 2013.[39]  An impairment questionnaire dated March 11, 2014 indicated his diagnosis of myalgia, myositis, lumbago, cervicalgia, sciatica, and chronic left knee pain.[40]  He cited her primary symptoms as pain in the upper and lower back that ran down both hips and in her neck and right shoulder.[41]  Dr. Cemerlic counseled plaintiff could sit or stand for one hour or less in an eight hour work day, would require a shift of position every ten to fifteen minutes in a work setting, and could occasionally carry or lift no more than ten pounds.[42]

### 2. Asthma

Plaintiff has suffered with asthma for over twenty years.[43]  In September 2011, she sought treatment at Kent General Hospital for wheezing and exacerbation of this condition.[44]  Dr. Tankala diagnosed the asthma and shortly thereafter, she was

---

[35] *Id.* at 718.
[36] *Id.* at 859.
[37] *Id.* at 857.
[38] *Id.* at 857-859.
[39] *Id.* at 971.
[40] *Id.*
[41] *Id.* at 972.
[42] *Id.* at 973.
[43] *Id.* at 722.
[44] *Id.* at 423-424.

evaluated in the emergency room for shortness of breath and asthma.[45]  In November

2011, she showed no respiratory symptoms, but a 'mild exacerbation' of her asthma.[46]

After an emergency room examination in December 2011 revealed wheezing, plaintiff

was diagnosed with asthma and chronic lower back pain.[47]  That same month, she was

prescribed a ten day course of steroids for a persistent cough with wheezing and

shortness of breath.[48]  In February 2012, plaintiff was evaluated again in the emergency

room for an asthma attack.[49]  The resulting examination showed mild distress and

wheezing in her lung fields.[50]  She was diagnosed with asthma and acute bronchitis.[51]

Plaintiff continued to show symptoms of acute bronchitis and shortness of breath in

February 2012.[52]

     Dr. Walsh, a pulmonologist, started treating plaintiff in April 2012 for asthma,

nasal allergies, chronic bronchitis, and occupational asthma.[53]  She showed

improvement with the asthma in April, May, and July 2012.[54]  Dr. Walsh summarized

plaintiff's symptoms and conditions in January 2013 as follows:  shortness of breath,

chest tightness, wheezing, episodic acute asthma and acute bronchitis, and coughing.[55]

Additionally, Dr. Walsh found she would be able to sit or stand for one hour and would

---

[45] *Id.* at 424, 636.
[46] *Id.* at 641.
[47] *Id.* at 585-586.
[48] *Id.* at 584.
[49] *Id.* at 546.
[50] *Id.* at 546.
[51] *Id.* at 547.
[52] *Id.* at 549, 555.
[53] *Id.* at 889-890.
[54] *Id.* at 682-683, 721.
[55] *Id.* at 889-895.

require one or two breaks of fifteen to thirty minutes every eight hour workday.[56]
Following this report, plaintiff complained of wheezing and congestion during
subsequent visits with Dr. Walsh in November 2013 and April 2014.[57]

### 3.    Mental Health Problems

In September 2011, plaintiff was evaluated and started treatment for depression
and anxiety.[58]  She complained of difficulty sleeping, and was diagnosed with major
depressive disorder by Ihuoma Chuks, A.P.N.-N.P. at the Mind and Body Consortium.[59]
An assessment from that month indicates plaintiff was coherent, alert, orientated, and
able to concentrate.[60]  Additionally, the assessment shows she had a decent memory,
satisfactory judgment, and insight without hallucinations or delusions.[61]  Her Global
Assessment Function ("GAF") score[62] was 58.[63]  The following month Chuks noted
plaintiff's sleep had improved, but she remained depressed.[64]  Her GAF score increased
to a range of 60-65, indicating mild symptoms or functional difficulties, and insomnia
was diagnosed.[65]  Plaintiff reported her medications improved her depression in

---

[56] *Id.* at 892-894.
[57] *Id.* at 1007-1008.
[58] *Id.* at 479-482.
[59] *Id.*
[60] *Id.* at 480-481.
[61] *Id.* at 480-481.
[62] The GAF scale ranges from 0-100.  A score of 51-60 denotes moderate symptoms, while a score of 61-70 indicates mild symptoms or functional difficulties.  A score of 31-40 indicates (1) some impairment in reality testing or communication or (2) major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  D.I. 12 at 8; D.I. 14 at 8.
[63] *Id.* at 482.
[64] *Id.* at 473.
[65] *Id.* at 478.

December 2011.[66]

In January 2012, she was first admitted into Connections, Community Support Programs and started seeing Dr. Nancy Cleary, who became her mental healthcare doctor.[67]  An ensuing mental status exam concluded plaintiff was well organized, alert, had decent memory and recollection, and had good insight and judgment.[68] Connections staff recorded her GAF score as 55 in January 2012.[69]  She reported nightmares and depression related to her physical pain in the following month.[70]  A report completed by Dr. Frye at the Mind and Body Consortium noted her memory, speech, thought process, and mood were all considered normal.[71]  She was proscribed Cymbalta and Trazodone, which improved her depression and anxiety by March 2012.[72] However, in April 2012, plaintiff discontinued the Cymbalta because of weight gain and its affect on her physical pain.[73]  Her depression and anxiety worsened.[74]  Her dose of Trazodone consequently increased and Zoloft was substituted for Cymbalta.[75]

Plaintiff began seeing Dr. Sacre in September 2012.[76]  She related in October 2012 that the medication helped.[77]  By January 2013, Dr. Sacre noted improvement in

------

[66] *Id.* at 471.
[67] *Id.* at 67, 950.
[68] *Id.* at 701.
[69] *Id.* at 702.
[70] *Id.* at 687.
[71] *Id.* at 685.
[72] *Id.* at 685, 687.
[73] *Id.* at 683.
[74] *Id.*
[75] *Id.*
[76] *Id.* at 900.
[77] *Id.* at 695.

her mental health.[78]  The following month, Dr. Sacre completed an

psychiatric/psychological impairment questionnaire and diagnosed major depression

and PTSD.[79]  He noted her past and present GAF was 35.[80]  He found she was

moderately limited in remembering locations and work-like procedures, understanding

and remembering simple instructions, and maintaining attention for extended periods of

time.[81]  Furthermore, he concluded she was markedly limited in working in coordination

with others without being distracted.[82]

In April 2013, a mental status exam by Dr. Cleary stated plaintiff had racing

thoughts, a depressed and irritable mood, occasional paranoia, hallucinations, and

forgetfulness.[83]  She was diagnosed with major depressive disorder, generalized anxiety

disorder, and cocaine and alcohol dependence that was in remission.[84]  In July 2013,

plaintiff was discharged from Connections because she was unresponsive to attempts

to reengage her in treatment.[85]  Dr. Cleary noted plaintiff's GAF score was 58 in April

2013.[86]  In December 2013, her GAF score was 60 and she still had anxiety and

depression.[87]  Her memory, attention, thought processes, and intellect were all

considered good.[88]  After her brother's death in February 2014, her memory, reasoning,

---

78 *Id.* at 970.
79 *Id.* at 900.
80 *Id.*
81 *Id.* at 903.
82 *Id.*
83 *Id.* at 947-948.
84 *Id.* at 948.
85 *Id.* at 950.
86 *Id.*
87 *Id.* at 933, 1036.
88 *Id.* at 934.

impulse control, judgment, and thought processes remained stable.[89]   However, in April

2014, her anxiety and depression worsened.[90]

### B.      Hearing Testimony

### 1.      Plaintiff's Testimony

At the May 22, 2014 video hearing, plaintiff testified about her background, work

history, and her alleged disability.[91]   She is approximately five-foot-four inches tall and

weighs about 168 pounds.[92]   She is single and lives with her 81-year-old mother and her

mentally disabled brother.[93]   She has not worked since May 2011.[94]   She completed her

GED in 2010.[95]

Plaintiff stated she worked as a housekeeper for a few years before developing

chronic asthma from an allergic reaction to cleaning chemicals.[96]   After working as a

housekeeper, she was incarcerated for conspiracy for drug distribution for ten years.[97]

She denied using cocaine for approximately the past twenty years.[98]   Upon being

released, she started working as a dishwasher for about three to four months.[99]   She

then worked as a newspaper inserter until the company was sold, when she was hired

as a packer.[100]   She estimated as a newspaper inserter, she was required to lift and

---

[89] *Id.* at 1038.
[90] *Id.* at 1040.
[91] *Id.* at 58-74.
[92] *Id.* at 59.
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] *Id.* at 62.
[97] *Id.*
[98] *Id.* at 63.
[99] *Id.* at 61.
[100] *Id.* at 60-61.

carry about fifteen to twenty pounds while standing.[101]  As a packer, she had to carry approximately ten to twelve pounds on a regular basis, push and pull boxes, and stand on the job.[102]  Plaintiff was let go from her packing job because she was "slowing down" on the job due to her back ache and painful sciatic nerves.[103]

Concerning her daily activities, plaintiff testified she handles her personal hygienic needs (though she cannot tie her shoes), can change the bedding, wash dishes, and do food shopping.[104]  She can put clothes in the washer, but cannot remove them or vacuum.[105]  Plaintiff related her daily routine includes sitting on the bed with pillows tucked under her knees and back and taking occasional walks outside.[106]  She reads, does crossword puzzles, and enjoys movies and television.[107]  She can no longer crochet due to rheumatoid arthritis in her wrist.[108]

Plaintiff described how her symptoms restricted her ability to work.[109]  Because of stiffness in her back, arms, and knees, she is unable to perform her previous employment.[110]  The pain medication causes drowsiness and dizziness, and interferes with work.[111]  She can lift and carry about four to five pounds, but is unable to lift a gallon of milk.[112]  Plaintiff stated she is able to sit for about ten to fifteen minutes and

---

[101] *Id.* at 61.
[102] *Id.* at 60.
[103] *Id.*
[104] *Id.* at 70, 74.
[105] *Id.*
[106] *Id.* at 71.
[107] *Id.*
[108] *Id.*
[109] *Id.*
[110] *Id.* at 63.
[111] *Id.* at 65.
[112] *Id.* at 67.

stand for about twenty minutes at a time.[113]  She uses a cane when walking[114] and can walk less than half of a block.[115]  She started using a cane due to sciatica, which causes a stabbing pain from her back, into her buttocks, feet and ankles.[116]  Her sciatica occasionally causes her left leg to drag.[117]  Plaintiff has chronic asthma that "comes on-and-off" for which she has a nebulizer.[118]  The asthma causes loss of breath or choking.[119]  She has never been hospitalized for any acute or emotional mental health problems, but reasoned mental health issues would affect employment[120] because she sometimes has difficulty sleeping, despite taking medication.[121]  On average, she sleeps four to five hours a night, and takes hour long naps daily.[122]  Plaintiff also suffers from memory loss.[123]

Regarding treatment, plaintiff related she has not undergone neck or back surgery, but has received physical therapy and cortisone injections, which have not helped.[124]  Her current medications for her back and neck include oxycodone and methadone.[125]  She also takes medication for her rheumatoid arthritis.[126]  The

---

[113] *Id.* at 67-68.
[114] Use of a cane is recommended, but not prescribed by a physician.  *Id.* at 68.
[115] *Id.*
[116] *Id.* at 68, 73.
[117] *Id.*
[118] *Id.* at 65.
[119] *Id.* at 66.
[120] Plaintiff claimed she often feels like someone is following her.  *Id.* at 67.
[121] *Id.*
[122] *Id.* at 72.
[123] *Id.* at 74.
[124] *Id.* at 63.
[125] *Id.* at 64.
[126] *Id.*

medications cause anxiety, hearing things, and decreased appetite.[127]  While her left knee surgery occurred in May 2012, she has had no significant knee treatment since then.[128]  If her knee becomes symptomatic, she has an injection approximately every six or seven months that helps alleviate the pain.[129]

### 2.    The Vocational Expert's Testimony

The vocational expert, Linda Augins, testified about plaintiff's background, skills, and limitations, and the jobs available within her restrictions.[130]  Augins classified plaintiff's work experience as a housekeeper as unskilled with light exertion, dishwasher and newspaper inserter as unskilled with medium exertion, and packer as unskilled with medium exertion, but light exertion as performed.[131]

During the hearing, the ALJ and Jennifer Walker, plaintiff's attorney, posed several hypothetical situations.[132]  All were based on a hypothetical 55-year-old woman with a high school education and plaintiff's past work history.[133]

In the first hypothetical, the individual could perform light work, provided the work did not require more than occasional postural activities and only simple repetitive tasks.[134]  The hypothetical person would not be exposed to excessive dust, fumes, odors, or gases.[135]  In response, Augins testified plaintiff's work as an inserter and

---

[127] *Id.* at 72.
[128] *Id.* at 64.
[129] *Id.*
[130] *Id.* at 75-80.
[131] *Id* at 75.
[132] *Id.* at 76-80.
[133] *Id.* at 76.
[134] *Id.*
[135] *Id.*

packer would conform to the hypothetical.[136]  In addition, she testified three unskilled light jobs would also fit the hypothetical:  cashier, dining room attendant, and garment sorter.[137]

The second hypothetical had the same limitations as the first, but with the additional restriction that the individual would be absent from work about two or three times per month.[138]  Augins testified such a restriction would preclude employment.[139]

The third hypothetical posed by Walker limited the hypothetical individual to lifting only up to ten pounds occasionally and standing or walking up to one hour in an eight hour work day.[140]  Augins testified such a restriction and limited standing would result in normal exertion.[141]

In the fourth hypothetical, Walker limited standing and walking up to one hour in an eight hour work day and sitting to six to seven hours in an eight hour work day in addition to the restriction of lifting up to ten pounds occasionally.[142]  Augins testified such limitations and restriction would result in less than sedentary exertion.[143]

In the final hypothetical, Walker posed the hypothetical individual needed to stand and move every ten to fifteen minutes for ten minutes.[144]  Augins concluded such limitation would preclude employment.[145]

---

[136] *Id.*
[137] *Id.* at 77.
[138] *Id.* at 78.
[139] *Id.*
[140] *Id.*
[141] *Id.* at 79.
[142] *Id.* at 79-80.
[143] *Id.* at 80.
[144] *Id.*
[145] *Id.*

### 3.     The ALJ's Findings

Based on the medical evidence and testimony, the ALJ determined plaintiff was

not disabled and, therefore, ineligible for Social Secuirty Disability Insurance and

Supplemental Security Income.[146]  The ALJ's findings are summarized as follows:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.     The claimant has not engaged in substantial gainful activity since May 20, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: back disorder, neck disorder, left knee disorder (status post surgery), asthma, fibromylagia, polyarthritis, and mood disorder (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have any impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 202, Subpart P, Appendix 1 (20 FCFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except she can perform no more than occasional postural activities, with no climbing.  She cannot be exposed to excessive environmental conditions such as dust, fumes, odors, and/or gases.  She can perform no more than simple, routine, repetitive tasks, due to limitations in concentration, persistence, or pace.

6.     The claimant is capable of performing past relevant work as a newspaper inserter and packer.  This work

---

[146] *Id.* at 46-47.

does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from May 20,2011, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).[147]

## III.   STANDARD OF REVIEW

### A.   Motion for Summary Judgment

Both parties move for summary judgment.  In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party[,]' but [refraining from] weighing the evidence or making credibility determinations."[148]  If "there is no genuine issue as to any material fact" and the movant is entitled to judgment as a matter of law, summary judgment is appropriate.[149]

This standard does not change merely because there are cross-motions for summary judgment.[150]  Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.[151]

"The filing of cross-motions for summary judgment does not require the court to grant

---

[147] *Id.* at 38-46.
[148] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted).
[149] *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R. CIV. P. 56(c)).
[150] *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).
[151] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

16

summary judgment for either party."[152]

## B.  Review of the ALJ's Findings

Section 405(g) sets forth the standard of review of an ALJ's decision.  The court

may reverse the Commissioner's final determination only if the ALJ did not apply the

proper legal standards, or the record did not contain substantial evidence to support the

decision.  Factual findings are upheld if supported by substantial evidence.[153]

Substantial evidence means less than a preponderance, but more than a mere scintilla

of evidence.[154]  As the United States Supreme Court has found, substantial evidence

"does not mean a large or significant amount of evidence, but rather such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."[155]

In determining whether substantial evidence supports the Commissioner's

findings, the court may not undertake a *de novo* review of the decision nor re-weigh the

evidence of record.[156]  The court's review is limited to the evidence that was actually

presented to the ALJ.[157]  The Third Circuit has explained that a:

> single piece of evidence will not satisfy the substantiality test if the
> [Commissioner] ignores, or fails to resolve, a conflict created by
> countervailing evidence.  Nor is evidence substantial if it is overwhelmed
> by other evidence, particularly certain types of evidence (e.g., evidence
> offered by treating physicians) or if it really constitutes not evidence but
> mere conclusion.[158]

---

[152] *Krupa v. New Castle Cnty.*, 732 F. Supp. 497, 505 (D. Del. 1990).
[153] *See* 42 U.S.C. §§405(g); *see also Monsour Med. Ctr. v. Heckle*, 806 F.2d 1185, 1190 (3d Cir. 1986).
[154] *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).
[155] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).
[156] *Monsour*, 806 F.2d at 1190.
[157] *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001).
[158] *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable.[159]  Even if the court would have decided the case differently, it must defer to and affirm the ALJ so long as the decision is supported by substantial evidence.[160]

Where "review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision."[161]  In *SEC v. Chenery Corp.*, the Court found that a "reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."[162]  "If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."[163]  The Third Circuit has recognized the applicability of this finding in the Social Security disability context.[164]  This court's review is limited to the four corners of the ALJ's decision.[165]  In Social Security cases, the substantial evidence standard applies to motions for summary judgment brought pursuant to FED. R. CIV. P. 56.[166]

---

[159] *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).
[160] *Monsour*, 806 F.2d at 1190-91.
[161] *Hansford v. Astrue*, 805 F. Supp. 2d 140, 144-45 (W.D. Pa. 2011).
[162] 332 U.S. 194, 196 (1947).
[163] *Id.*
[164] *Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001).
[165] *Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D. Pa. 2005).
[166] *See Woody v. Sec'y of the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV.     DISCUSSION

### A.     Parties' Contentions

In her appeal, plaintiff contends the ALJ improperly afforded great weight to the non-examining physicians' opinions, while affording little weight to the opinions of her treating physicians (Drs. Cemerlic, Walsh, and Sacre).[167]  Plaintiff further argues the ALJ failed to properly evaluate her credibility.[168]  Finally, she maintains the ALJ relied on flawed vocational expert testimony due to deficient hypothetical questioning.[169]

The Commissioner counters:  the ALJ afforded proper weight to the medical evidence of record, and substantial evidence supports both the ALJ's credibility analysis and the ALJ's Residual Functional Capacity (RFC) assessment.[170]

### B.     Disability Analysis

Title II of the Act, 42 U.S.C. § 423(a)(I)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability."[171]  To qualify for DIB, a claimant must establish disability prior to the date she was last insured.[172]  A "disability" is defined as the inability to do any substantial gainful activity because of any medically determinable physical or mental impairment, which either could result in death or has lasted or can be expected to last for a continuous period of at least 12 months.[173]  To be disabled, the severity of

---

[167] D.I. 12 at 1.
[168] *Id.*
[169] *Id.*
[170] D.I. 14 at 1.
[171] *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).
[172] *See* 20 C.F.R. § 404.131.
[173] 42 U.S.C. §§ 423(d)(I)(A), 1382(c)(a)(3).

the impairment must prevent return to previous work, and based on age, education, and work experience, restrict "any other kind of substantial gainful work which exists in the national economy."[174]

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis.[175]  If a finding of disability or non-disability can be made at any point in the sequential process, the review ends.[176]  At the first step, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity, and if so, a finding of non-disabled is required.[177]  If the claimant is not so engaged, step two requires the Commissioner to determine whether the claimant is suffering from an impairment or a combination of impairments that is severe.  If no severe impairment or a combination thereof exists, a finding of non-disabled is required.[178]

If the claimant's impairments are severe, the Commissioner, at step three, compares them to a list of impairments ("the listings") that are presumed severe enough to preclude any gainful work.[179]  When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled.[180]  If a claimant's impairment, either singularly or in combination, fails to meet or medically

---

[174] 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).
[175] 20 C.F.R § 404.1520; see also *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).
[176] 20 C.F.R. § 404.1520(a)(4).
[177] 20 C.F.R. § 404.1520(a)(4)(I).
[178] 20 C.F.R. § 404.1520(a)(4)(ii).
[179] 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F. 3d at 428.
[180] 20 C.F.R. § 404.1520(a)(4)(iii).

20

equal any listing, the analysis continues to steps four and five.[181]  At step four, the
Commissioner determines whether the claimant retains the RFC to perform her past
relevant work.[182]  A claimant's RFC is "that which an individual is still able to do despite
limitations caused by [her] impairment(s)."[183]  "The claimant bears the burden of
demonstrating an inability to return to [her] past relevant work."[184]

If the claimant is unable to return to her past relevant work, step five requires the
Commissioner to determine whether the claimant's impairments preclude adjusting to
any other available work.[185]  At this final step, the burden is on the Commissioner to
show the claimant is capable of performing other available work existing in significant
national numbers and consistent with the claimant's medical impairments, age,
education, past work experience, and RFC before denying disability benefits.[186]  In
making this determination, the ALJ must analyze the cumulative effect of all the
claimant's impairments and often seeks the assistance of a vocational expert.[187]

### 1.    Weight Accorded to Opinion Evidence

Plaintiff asserts the ALJ erred by affording "little weight" to the opinions of Drs.
Cemerlic, Walsh, and Sacre, while giving substantial weight to the opinions of non-
examining medical consultants.[188]  A cardinal principle guiding disability eligibility
determinations is that the ALJ accord treating physicians' reports great weight,

---

[181] 20 C.F.R. § 404.1520(e).
[182] 20 C.F.R. § 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428.
[183] *Fargnoli*, 247 F.3d at 40.
[184] *Plummer*, 186 F.3d at 428.
[185] 20 C.F.R. § 404.1520(g); *Plummer*, 186 F.3d at 427-28.
[186] *Plummer*, 186 F.3d at 427-28.
[187] *Id.*
[188] D.I. 12 at 16.

especially "when the opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."[189]  Such reports will be afforded controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence on record.[190]

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled.[191]  It is error, however, to apply controlling weight to an opinion merely because it comes from a treating source if it is not well-supported by the medical evidence, or inconsistent with other substantial evidence, medical or lay, in the record.[192]  If the ALJ rejects the treating physician's assessment, he may not make "speculative inferences from medical reports," and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence."[193] Further, medical testimony from a doctor who has never examined the claimant should not be given credit if it contradicts the testimony of the claimant's treating physician.[194]

If the ALJ does not give a physician's report controlling weight, he must examine multiple factors.[195]  These factors include the "[e]xamining relationship," the "[t]reatment relationship" which considers the "[l]ength of the treatment relationship and the

---

[189] *Morales v. Apfel*, 225 F. 3d 310, 317 (3d Cir. 2000).
[190] *Fargnoli*, 247 F.3d at 43.
[191] *Morales*, 225 F.3d at 317 (citing *Plummer*, 186 F.3d at 429).
[192] SSR 96-2p, 1996 WL 374188 at *2.
[193] *Plummer*, 186 F.3d at 429.
[194] *Dorf v. Bowen*, 794 F.2d 896, 901 (3d Cir. 1986).
[195] 20 C.F.R. §404.1527(c).

frequency of examination," the "[n]ature and extent of the treatment relationship," the degree and extent the relevant evidence supports a treating physician's opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating physician in relation to the medical issues involved.[196]  An ALJ must weigh all the evidence in the record.[197]  Failure of an ALJ to examine and elaborate on these factors is grounds for remand.[198]

### a.   Weight Accorded to Dr. Cemerlic

The ALJ assigned "little weight" to Dr. Cemerlic's opinion due to its inconsistency with mixed objective evidence, plaintiff's activities of daily living, and her conservative treatment history.[199]  Dr. Cemerlic's opinion is based on clinical exams and MRI findings.[200]  The ALJ points to mixed, sometimes benign objective evidence in the record, including:  "normal ambulation, normal extremity range of motion, normal cervical range of motion, good grip strength, no motor of sensory deficit, normal reflexes, and negative straight leg raising."[201]  Plaintiff received conservative treatment for her neck and back pain through steroidal injections and pain medications.[202] Further, while the ALJ's observation of the claimant alone cannot serve as the sole determining factor of the claimant's impairment, her activities of daily living contradict

---

[196] *Id.*
[197] *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000).
[198] *Solomon v. Colvin*, C.A. No. 12-1406-RGA-MPT, 2013 WL 5720302, at *12 (D.Del. Oct. 22, 2013).
[199] D.I. 7 at 44.
[200] *Id.* at 439, 971-972.
[201] *Compare Id.* at 42-43, *with Id.* at 971-978.
[202] *Id.* at 628, 1009-1028.

Dr. Cemerlic's description of her physical impairments.[203]   Based on this medical evidence and plaintiff's activities of daily living, the ALJ reasonably concluded that Dr. Cemerlic's opinion should be given little weight.

### b.     Weight Accorded to Dr. Walsh

The ALJ properly weighed the medical findings of Dr. Walsh.  The ALJ assigned "little weight" to Dr. Walsh because his characterization of plaintiff's asthma was inconsistent with the medical records.[204]   The ALJ appropriately examined the holistic record and elaborated upon the elements of 20 C.F.R. § 404.1527(c).

Dr. Walsh treated plaintiff approximately every three months since April 2012.[205] His opinions were based on his exams, pulmonary function testing, clinical evidence of her symptoms, and her frequent visits to the emergency room.[206]   The ALJ found plaintiff's recent pulmonary function test showed "only mild restrictive ventilatory defect, and significant improvement with bronchodilator therapy."[207]   Further, the ALJ noted though her emergency room visits were frequent, plaintiff never had related inpatient hospitalizations.[208]   Plaintiff asserts hospitalization is not a prerequisite to consider a condition severe.[209]   However, Dr. Walsh's characterization of plaintiff's condition[210] does not comport with the medical records that suggest a less severe case of asthma:

---

[203] *Compare Id.* at 68-71, *with Id.* at 971-978.   *See Frankenfield v. Bowens*, 861 F.2d 405 (3d Cir. 1998).
[204] *Id.* at 44.
[205] *Id.* at 889.
[206] *Id.* at 889-891.
[207] *Id.* at 44.
[208] *Id.*
[209] D.I. 12 at 17-18.
[210] D.I. 7 at 889-895.

one with symptoms that were never so severe that they warranted her admittance to the hospital for treatment.  The ALJ's reasoning for assigning Dr. Walsh's opinion little weight is therefore supported by substantial evidence.

### c.      Weight Accorded to Dr. Sacre

Here, the ALJ properly weighed the opinion of Dr. Sacre.  The ALJ afforded "little weight" to Dr. Sacre's opinion because it was largely inconsistent with the other mental status evidence on the record, which showed plaintiff's behavior and cognition to be normal.[211]  The ALJ also noted Dr. Sacre's opinion was inconsistent with plaintiff's conservative mental health treatment and the extent of her activities of daily living.[212] The other evidence on the record comes primarily from Dr. Cleary, whose assessments differed greatly both before and after Dr. Sacre's psychological impairment questionnaire.[213]  While plaintiff had been treated by Dr. Sacre since September 2012, Dr. Cleary was her mental healthcare doctor for a comparable period of time.  Though some of the symptoms he noted are consistent with other medical records, Dr. Sacre's analysis of plaintiff's GAF score wildly differed from both GAF scores on record before and after his assessment.

### 2.      Credibility Assessment

Plaintiff argues the ALJ erred in evaluating the credibility of her subjective complaints.[214]  The ALJ must follow a two-step process for evaluating symptoms.[215]

---

[211] *Compare Id.* at 45, *with Id.* at 900-907.
[212] *Id.*
[213] *Id.* at 45, 702, 933, 950.
[214] D.I. 12 at 25.
[215] SSR 96-7p (S.S.A.), 1996 WL 374186, at *2.

First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment . . .  that could reasonably be expected to produce the individual's pain or other symptoms."[216]  Second, the ALJ must "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."[217]  Under this evaluation, a variety of factors are considered, such as:  (1) "objective medical evidence," (2) "daily activities," (3) "location, duration, frequency, and intensity," (4) "type, dosage, effectiveness, and side effects of any medication," (5) treatment (other than medication), (6) and "other factors" concerning plaintiff's limitations.[218]

In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence depends on his/her credibility.[219]  When evaluating a claimant's credibility, the ALJ must consider the entire case record and give specific reasons for the weight given to the individual's statements.[220]  A strong indication of credibility is consistency, including the consistency of an individual's own statements, and with other information in the record.[221]  Additionally, an individual's statements may be less credible if the record shows the individual did not follow the treatment as prescribed.[222]  In making a finding about the credibility of a claimant's statements, the adjudicator need not totally accept or reject them, and may find some statements to be

---

[216] *Id.*
[217] *Id.*
[218] 20 C.F.R. § 404.1529(c).
[219] SSR 96-7p, at *4.
[220] *Id.*
[221] *Id.* at *5.
[222] *Id.* at *7.

partially credible.[223]

Here, the ALJ found plaintiff's credibility diminished due to normal objective findings mixed with abnormal signs on multiple occasions, conservative treatment, her daily activities, incarceration for a drug offense, and observed lack of reliance on her cane.[224]  The ALJ noted plaintiff exhibited both abnormal signs and normal findings during physical and mental examinations.[225]  For example, based on physical examinations, she exhibited tenderness and swelling in her left knee, but had full range of motion and no instability.[226]  With regards to her asthma, the record shows abnormal findings such as wheezing, labored respiration, and diminished air entry, while also indicating normal respiration on several occasions and significant improvement with bronchodilator therapy.[227]  Further, the record shows mood and affect abnormalities, but most frequently, her examinations revealed normalcy in a host of categories, including thought content, speech, attention, and concentration.[228]

Plaintiff is independent in the majority of daily living activities, and the ALJ noted these activities are not as limited to the extent expected, given her complaints.[229]  She participates in activities requiring concentration:  reading, crossword puzzles, and watching movies and television.[230]  The ALJ also noted plaintiff was seen walking into

---

[223] *Id.* at *4.
[224] D.I. 7 at 43-44.
[225] *Id.* at 42.
[226] *Id.* at 43.
[227] *Id.*
[228] *Id.*
[229] *Id.* at 44.
[230] *Id.* at 44, 71.

the hearing with a cane, but she was "observed to not be relying on it for ambulation."[231] Furthermore, her mental impairments have not warranted hospitalization since the disability onset and both physical and mental impairments have been treated conservatively.[232]  The ALJ's decision to view plaintiff's testimony with diminished credibility should be upheld because it is supported by sufficient evidence.

### C.    Vocational Expert Testimony

Finally, plaintiff argues the ALJ relied on flawed vocational expert testimony due to the construction of the hypothetical questioning.[233]

"A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence."[234]  "'[G]reat specificity' is required when an ALJ incorporates a claimant's mental or physical limitations into a hypothetical."[235] "Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence."[236]

Plaintiff relies on *Ramirez v. Barnhart* to argue when a hypothetical question does not accurately describe all of her mental and physical limitations, the opinion of the vocational expert is not supported by substantial evidence.[237]  In *Ramirez*, the Third

---

[231] *Id.*
[232] *Id.* at 43-44.
[233] D.I. 12 at 27.
[234] *Crupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).
[235] *Ramirez v. Barnhart*, 372 F.3d 546, 554-555 (3d Cir. 2004) (quoting *Burns v. Barnhart*, 312 F.3d 113, 122 (3d Cir. 2002)).
[236] *Burns*, 312 F.3d at 123.
[237] D.I. 12 at 27.

Circuit found error when an ALJ relied on hypothetical questioning which was inconsistent with the ALJ's own finding that the claimant often suffered from deficiencies in concentration, persistence, or pace.[238]  However, *Ramirez* also acknowledged the omission from a hypothetical could be reasonable and valid if "the deficiency in pace was so minimal or negligible that . . .  it would not limit her ability to perform simple tasks under a production quota."[239]  In line with this finding, the ALJ accepted the vocational expert's opinion that the claimant could perform work that would have daily production quotas - provided it was limited to simple tasks.[240]  The omission of claimant's mental limitations in the ALJ's hypothetical questioning regarding how a claimant that often suffers from pace deficiencies could perform work with daily production quotas was appropriate, and not fatal to the ALJ's analysis and conclusion.

Here, the ALJ's hypothetical questioning of the vocational expert included plaintiff's physical limitations, and omitted her mental limitations.[241]  The ALJ described her mental limitations as having moderate difficulties with regards to concentration, persistence, or pace.[242]  Furthermore, the ALJ cited mental status examinations showing benign findings for concentration, persistence, and pace.[243]  Any purported mental limitations are well-documented in the record and suggest these limitations are minimal or negligible, such that it would not inhibit her ability to perform simple tasks.[244]

---

[238] *Ramirez*, 372 F.3d at 554.
[239] *Id.* at 555.
[240] D.I. 7 at 40.
[241] *Id.* at 76.
[242] *Id.* at 40.
[243] *Id.* at 40, 45.
[244] *Id.*

The ALJ's determination that plaintiff has the RFC to perform "simple, routine, repetitive tasks" is supported by substantial evidence.[245]  Therefore, the ALJ's omission of plaintiff's mental limitations in his hypothetical questioning was appropriate and does not render the vocational expert's testimony deficient.

**V.     CONCLUSION**

For the foregoing reasons, I recommend that:

(1) Plaintiff's motion for summary judgment (DI 11) be denied; and

(2) Defendant's motion for summary judgment (DI 13) be granted.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72(b)(1), and D. DEL. LR 72.1.  The parties may serve and file specific written objections within ten (10) days after being served with a copy of this Report and Recommendation.

The parties are directed to the Court's Standing Order in Non-Pro Se matters for Objections Filed under FED. R. CIV. P. 72, dated October 9, 2013, a copy of which is available on the Court's website, www.ded.uscourts.gov.

Date: June 2, 2016                                    /s/ Mary Pat Thynge
                                                      United States Magistrate Judge

---

[245] *Id.* at 46.